# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

|  |  |  |
|---|---|---|
| **MOSEKA BUMBA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 09-CV-2314** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE PAVILION FOUNDATION,** | ) | |
| **d/b/a** | ) | |
| **"THE PAVILION BEHAVIORAL** | ) | |
| **HEALTH SYSTEM"** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## OPINION

This is an employment discrimination case in which the plaintiff argues that she was terminated on the basis of her race. The case is before the court on Defendant's Motion for Summary Judgment (#35). This court has reviewed the briefs and documents provided by the parties, including, but not limited to, the deposition transcript and the employee files. Following this careful review, the court concludes that, despite taking all the facts in her favor, Plaintiff cannot demonstrate that she was meeting Defendant's legitimate job expectations and cannot show that a similarly situated employee not in the protected class was treated more favorably. Accordingly, Defendant's Motion to Strike (#44) is GRANTED, Plaintiff's Motion to Amend/Correct (#45) is DENIED, and Defendant's Motion for Summary Judgment (#35) is GRANTED.

- 1 -

**Jurisdiction**

This court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

Plaintiff brings her action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. § 2000e *et seq*. and the Civil Rights Act of 1991, as well as 42 U.S.C. § 1981.

**Background**[1]

Plaintiff is an African-American. Plaintiff started working for Defendant Pavilion

("Defendant") on April 4, 2007. Defendant is a mental health treatment center that provides

residential services to youth ages 10-18 who are suffering from severe and chronic psychiatric,

emotional, behavioral, and/or addictive diseases. Plaintiff was hired as a Mental Health

Technician. Her employment status was at-will, which she acknowledged via a signed

acknowledge form as well as during her deposition. She also testified that she received a copy of

Defendant's work policy, which stated in pertinent part, as follows:

> The Facility has certain work rules and levels of conduct that must be adhered
> to by all employees. The Facility considers these work rules to be an essential
> employee responsibility.

---

[1] Because Plaintiff failed to follow Local Rule 7.1(D)(2) in filing her Response (#43), her filing contains no clearly enumerated statement of conceded or disputed facts that may be incorporated in this motion. Plaintiff's noncompliance permits this court to strike her Response in its entirety. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994). Further, Plaintiff either failed to participate in discovery or, if she did serve interrogatories or depose Defendants, she failed to file any of her discovery documents. Therefore, facts are taken from Defendant's Statement of Material Facts in Support of its Motion for Summary Judgment (#37) when they are adequately supported by the record, including, but not limited to, Plaintiff's deposition (#37 exh. A), and other documents provided by Defendant. The only place where Plaintiff's Response contains an assertion that clearly contests Defendant's material facts is an argument regarding the September 7, 2007 incident (discussed *infra* at footnote 2). The rest of the Response constitutes argument. For the complete order with citations, *see* Part I of the Analysis, below.

Violation of the rules identified below may call for some form of corrective action. In some cases, the action may result in preventive counseling, written warnings, final warning, suspension, and/or immediate employment termination. In serious cases or cases where an employee has previously violated the same or other rules or is not performing at an acceptable level, the employee may be subject to immediate employment termination.

It is necessary to point out that the types of misconduct identified below are merely examples of the conduct that may lead to such corrective action. This is <u>not</u> an all-inclusive list of all types of conduct that can result in corrective action up to and including immediate employment termination.

1. Verbal or physical abuse/threats, intimidating, swearing, or coercing behavior directed toward (or in the presence of) a patient, visitor or Facility employee.

[ * * * ]

3. Non-compliance with any established Facility policy, or work rule(s).

[ * * * ]

12. Any other misconduct which affects the quality of patient care service.

13. Insubordination, including refusal to do assigned work or refusal to perform work in the manner described by a supervisor without proper justification. <u>The propriety of the explanation offered by the employee will be evaluated by the Facility.</u>

(#37, exh. H) (emphasis in original).

Plaintiff's immediate supervisors included, among others, Jeff Smith. (#37 exh. A, 33-34). Her floor supervisor was Mercy DeJesus. (*Id.*) James Hamilton was the Director of Residential Services and Laurie Scoggins was the Director of Human Resources. (#37 exh. B).

On September 7, 2007, a Concern Report was entered for Plaintiff. (#37 exh. I). The report stated that a patient in Plaintiff's department had been missing from the unit but later returned to the department carrying coffee. The facts delineated in the report suggest that

- 3 -

Plaintiff either did not know where the missing patient was, or that she had covered up for the missing patient. The report then went on to suggest that Plaintiff was not suitable to work in that department. The name of the person reporting the incident is not legible on the report, but Defendant indicates that it is Plaintiff's shift leader.[2]

On December 26, 2007, Plaintiff had an annual performance review with her direct supervisor, Mercy DeJesus, and Laurie Scoggins, the Director of Human Resources. (#37 exh. J). Plaintiff received "Consistently Meets Standard" for the majority of her review. However, she received "Generally Meets Standard" (meaning that her performance could be improved) for several areas, including, but not limited to, "Establishes therapeutic relationship with patients and provides assigned patient care within the general policies, philosophy and objectives of the nursing department and the hospital", "Monitors unit milieu and maintains a safe, therapeutic environment for patients, family members and staff", "Uses the least restrictive approach to behavioral management and reflects the same in documentation", and "Exhibits excellent customer relations skills as evidenced by supportive and constructive communication with all contacts including co-workers, patients, visitors, families and referral sources." In the narrative, the report indicates that Plaintiff "has been observed using harsh tones with the patients and is often perceived as reactionary while implementing discipline", and "is unable to deal with patient frustrations in a calm manner".

_____

[2] This is the only place in Plaintiff's Response that contests material facts. Defendant claims that individual was a patient. Plaintiff alleges that the missing individual was a co-worker, not a patient, and that the person who made the report expected, without any justification, that Plaintiff would keep track of where her co-workers are. This information is described here only for completeness and has no evidentiary value because Plaintiff failed to provide evidence in support of those statements. Notably, the outcome of this opinion is unchanged even if that assertion were presumed to be true.

On May 5, 2008, a note was entered in Plaintiff's file. That note was from Smith, and read as follows:

> [Plaintiff] left w/o taping on Track IV's and is to be in at 6:45A to give a verbal report per her insistance [sic]. I called her a few minutes after she had left but apparently she did not want to return to tape. Anyway, I feel partly responsible in that I didn't catch it sooner... Apologies for that.

(#37 exh. L).

On May 13, 2008, a Concern Report was entered. The name of the person reporting and the text of the report are mostly illegible and where the handwriting is readable, the substance of the report is unintelligible. (#37 exh. M).

On July 8, 2008, a note was entered in Plaintiff's file. That note was left by a co-worker and read as follows:

> I have a concern about [Plaintiff]. When [Patient] A——[3] started to target her she made a comment that was inappropriate. She stated "I am not the one you want to mess with little girl." It was like [Plaintiff] had a power struggle with A—— all shift.

(#37 exh. N).

On July 10, 2008, an email was sent from a case manager to Hamilton. That email stated:

> I just got a phone call from A——'s[4] mom regarding the incident that took place on the unit on Tuesday night. A—— told her that [Plaintiff] was picking at her and threatening her and that A—— was put on precautions solely because of that. I clarified what had actually happened that night, but she would still ilke [sic] to talk to Delight, Jim and myself on Thursday (07/17) when she comes down here.

---

[3] The name was redacted in the report before it was filed with the court.

[4] As in footnote 3, the name was redacted in the report before it was filed with the court. Neither Plaintiff nor Defendant has indicated whether this patient, indicated as A——, is the same individual identified in the July 8, 2008 note.

> For the record, [Plaintiff] was picking at A—— and Lisa and Staci witnessed it. I asked them to write up what they saw and heard and to give it to either Steve or Jim. That is still no excuse for A—— to try to hit her, but it is also not therapeutic for A—— to be set up in that way.

(#37 exh. O).

On July 16, 2008, an RTC Coaching Form was entered in Plaintiff's file. That document was completed by Paul Kobylanski and indicated as follows:

> On Sunday 7/13/08: During a crisis [Plaintiff] was asked to supervise a hallway on RTC south. [Plaintiff] left the hallway on the request of one of the residents leaving the hallway unsupervised. Later in that evening she was asked to settle the same hallway down to transition to bed and was prompted several times to do so. After prompting several times I then placed a different staff in the hallway and asked to speak with [Plaintiff] at the nurses' station. When confronted about the request she reported she didn't want to go to hallway because one of the residents was asking to use [Plaintiff]'s cell phone. During the coaching, [Plaintiff] became loud and we moved to the OTR where she became more upset and rude, cursing and raising her voice. While talking to [Plaintiff], she walked away from the conversation saying that she didn't want to listen to this "bullshit". I then followed up with [Plaintiff] in the nurses station. After I left at the end of my shift it was reported to me that [Plaintiff] continued to talk to the other employees about me in a negative way. It was reported to me that she felt that I had an attitude and that I was rude to her.

(#37 exh. P).

Defendant included a document labeled Exhibit Q. The form indicated that Plaintiff's performance had been subpar and that her employment was to be terminated immediately. However, the form has no date, no name of the responsible parties, no signatures, and no other identifying information. (#37 exh. Q).

On August 4, 2008, Plaintiff had a meeting with Scoggins and Thompson. Plaintiff testified that during the meeting, she was told that she had been rude to patients, and that Defendant told her that she didn't "have a place to work on the first, second, or third floor. . .

- 6 -

[which] basically means you don't have a place here, because The Pavilion is first, second, and third floor." Plaintiff then "took the key, threw it on the table and left." (#37 exh A at 75-77). None of Defendant's employees told her that she was terminated, and an email from Scoggins to their unemployment insurance consultant states that "[w]e were not able to discuss terminating her." [ (#37 exh. R).

### Procedural posture

On December 21, 2009, Plaintiff filed her *pro se* Complaint (#1), naming Universal Health Services as the defendant. On February 23, 2010, Attorney Christopher Minelli appeared on behalf of Plaintiff, and Magistrate Judge David G. Bernthal granted his oral motion to appear *pro hac vice* while his admission paperwork was pending. On March 22, 2010, Plaintiff filed her First Amended Complaint (#12). On April 19, 2010, Plaintiff filed a Joint Motion to Amend the First Amended Complaint to replace Defendant Universal Health Services with Defendant The Pavilion Foundation (#13). On April 23, 2010, this court granted that motion. On April 26, 2010, Plaintiff filed her Second Amended Complaint (#14).

On May 5, 2010, Judge Bernthal entered a discovery order (#15), setting, among other dates, the deadline for all written and oral fact discovery to be completed by September 15, 2010, and the deadline for filing case dispositive motions by February 15, 2011.

On September 27, 2010, Attorney Minelli filed a motion to Withdraw as Attorney (#17), citing Illinois Rule of Professional Conduct Rule 1.16(b). On November 12, 2010, Judge Bernthal granted the Motion.

On March 23, 2011, Attorney Minelli appeared again, resuming his prior role. (#19).

On April 28, 2011, Judge Bernthal entered a revised discovery order, requiring all discovery to be completed by July 29, 2011, and case dispositive motions to be filed by November 30, 2011. (#21).

On July 29, 2011, Plaintiff filed her first Motion for Extension of Time to Complete Discovery (#22). The court granted the motion, extending the deadline to September 30, 2011.

On October 3, 2011, Plaintiff filed a second Motion for Extension of Time to Complete Discovery (#25). On October 4, 2011, the court granted the motion for extension, changing the discovery deadline to November 30, 2011. On December 7, 2011, Plaintiff filed a third Motion for Extension to Complete Discovery (#26). Following a hearing, Judge Bernthal granted Plaintiff's third Motion for Extension on December 13, 2011, changing the discovery deadline to February 29, 2012.

On February 21, 2012, Attorney Minelli filed his second Motion to Withdraw as Attorney of record (#27). On February 24, 2012, Judge Bernthal entered an order providing for any objections to be filed within 14 days. On March 1, 2012, the Clerk's Office noted that the notice of withdrawal, sent to Plaintiff's address at 2128 Harbortown Circle, Champaign, IL 61824, was returned as undeliverable (#29). The notice was re-sent, and also returned as undeliverable on March 6, 2012 (#30). On March 19, 2012, Judge Bernthal granted Attorney Minelli's motion to withdraw, and ordered that Plaintiff be noticed. On March 21, 2012, the notice was returned as undeliverable, the United States Post Office notation reading "Moved left no address / Unable to forward / Return to Sender" (#31). On April 23, 2012, a hearing was held before Judge Bernthal. Plaintiff appeared *pro se*. Defendant also appeared.

On August 10, 2012, Plaintiff filed her fourth Motion for Extension of Time to Complete

Discovery, *pro se* (#32). On August 27, 2012, Defendants filed a response, objecting, noting,

among other things, that Plaintiff had not made a single discovery request on Defendant since

April 23, 2012 (#33). Plaintiff did not contest that assertion. On September 25, 2012, this court

denied the fourth Motion for Extension (#34).

On October 4, 2012, Defendant filed the present Motion for Summary Judgment (#35),

along with its Statement of Uncontested Facts (#37). On October 26, 2012, Attorney Alane

Arbogast filed a motion to appear on behalf of Plaintiff (#39), and a motion for extension of time

to respond (#40). The court granted the extension on October 30, 2012. On November 20, 2012,

Plaintiff filed her Response to the Motion for Summary Judgment (#43). On December 4, 2012,

Defendant filed a Motion to Strike Response and Reply (#44). On December 21, 2012, Plaintiff

filed a Motion to Amend (#45). On January 7, 2013, Defendant filed its Response to the Motion

to Amend (#46).

## Analysis

### I. Motion to Amend/Correct

As a preliminary matter, the court addresses Defendant's Motion to Strike (#44) and

Plaintiff's Motion to Amend/Correct (#44). This court is permitted to strike or otherwise

disregard filings that fail to comply with Local Rule 7.1 (D). *Waldridge v. Am. Hoechst Corp.*,

24 F.3d 918, 924 (7th Cir. 1994). Local Rule 7.1(D)(2)(b) requires the respondent to state, in

separate subsections, the following:

(1) Undisputed material facts: List by number each fact from Section B of the motion for summary judgment which is conceded to be undisputed and material.

(2) Disputed Material Facts: List by number each fact from Section B of the motion for summary judgment which is conceded to be material but is claimed to be disputed. Each claim of disputed fact must be supported by evidentiary documentation referenced by specific page. Include as exhibits all cited documentary evidence not already submitted by the movant.

(3) Disputed Immaterial Facts: List by number each fact from Section B of the motion for summary judgment which is claimed to be both immaterial and disputed. State the reason the fact is immaterial. Support the claim that the fact is disputed with evidentiary documentation referenced by specific page. Include as exhibits all cited documentary evidence not already submitted by the movant.

(4) Undisputed Immaterial Facts: List by number each fact from Section B of the motion for summary judgment which is undisputed but is claimed to be immaterial. State the reason the fact is immaterial.

(5) Additional Material Facts: List and number each additional material fact raised in opposition to the motion for summary judgment. Each additional fact must be supported by evidentiary documentation referenced by specific page. Include as exhibits all relevant documentary evidence not already submitted by the movant.

Local Rule 7.1(D)(2)(b)(6) states that a failure to respond to any numbered fact will be deemed an admission of the fact. Further, "[m]otions for extension of time to file a motion for summary judgment or a response to a reply thereto will not be looked upon with favor; such motions may be summarily denied unless they are filed within the original time as allowed by this rule or by the scheduling order." Local Rule 7.1(D). The last operative deadline for dispositive motions was October 5, 2012. (Text Order of May 9, 2012). Defendant's Motion for Summary Judgment (#35) was filed on October 4, 2012, with responses due by October 29, 2012. Plaintiff waited until October 26, 2012, three days before the deadline, to retain her current attorney, Ms.

Arbogast (#39). Ms. Arbogast, understandably, filed a motion for extension of time to respond

(#40), which this court granted on October 30, 2012, extending the deadline to November 20,

2012. Plaintiff filed her Response on November 20, 2012 (#43). The Response was not in

compliance with Local Rule 7.1(D)(2)(b), as it included no statement of undisputed material

facts, no statement of disputed material facts, no statement of disputed immaterial facts, and no

statement of undisputed immaterial facts. Instead, the Response was in the form of a narrative,

with argument and contested facts commingled. Further, those arguments did not cite to adequate

evidentiary documentation. Local Rule 7.1(d) "follows from the obligation imposed by

Fed.R.Civ.P. 56(e) on the party opposing summary judgment to identify specific facts that

establish a genuine issue for trial, and it substantially facilitates the district court's task in

deciding whether a trial is indeed necessary." *Waldridge*, 24 F.3d 918 at 924.

This case has gone on for far too long as it is. Because Plaintiff's Motion to Amend (#45)

was filed on December 21, 2012, well past the original deadline for her Response, which was

October 29, 2012, Defendant's Motion to Strike (#44) is GRANTED, and Plaintiff's Motion to

Amend/Correct (#45) is DENIED.


**II. Summary Judgment**

"[S]ummary judgment is the put up or shut up moment in a lawsuit, when a party must

show what evidence it has that would convince a trier of fact to accept its version of events."

*Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (editing marks omitted).

After: two years of sitting on this court's docket; two different attorneys (one of whom withdrew

for unspecified reasons only to later reappear, and the other appearing after the present Motion

for Summary Judgment was filed); four extensions of time to complete discovery by Plaintiff (the last denied because she neglected to engage in any discovery for the four months prior to the previous motion); three notices mailed to Plaintiff's mailing address only to be returned as undeliverable (but after which she appeared in court *pro se*); and one attorney who neglected to follow one of the most significant and substantive Local Rules; this court's patience is at an end. Plaintiff's inability or refusal to participate in discovery is only to her detriment; this case being before the court on summary judgment, she has completely failed to provide any admissible evidence in her favor. Her counsel's Response (#43) includes no depositions, no testimony, no affidavits—just argument about Defendant's "characterizations of her job performance." "[I]n order to withstand summary judgment, the non-movant must allege *specific* facts creating a genuine issue for trial and may not rely on vague, conclusory allegations." *Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003).

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986*); Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). A factual dispute is "genuine" only if a reasonable jury could find for either party.

- 12 -

*SMS Demag Aktiengesellschaft v. Material Sciences Corp.*, 565 F.3d 365, 368 (7th Cir. 2009).

Count 1 of Plaintiff's Second Amended Complaint alleges that she was terminated due to race discrimination, in violation of 42 U.S.C. § 2000e-2(a)(1) (aka Title VII). Count 2 alleges the same thing, except under 42 U.S.C. § 1981. Title VII prohibits both race and sex discrimination in the employment context, whereas § 1981 prohibits race discrimination in the making and enforcing of contracts. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). Because Plaintiff does not differentiate the operative facts based upon the statute invoked, and because the elements of her claims and the methods of proof are essentially identical under either statute, the following analysis will apply equally to her claims under § 1981 and Title VII. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Plaintiff may attempt to prove race discrimination under either the direct or the indirect method. *Id*. at 393.

*A. Direct method*

To avoid summary judgment under the direct method, Plaintiff must provide either direct evidence of, or sufficient circumstantial evidence to allow an inference of intentional race discrimination. *Id*. Plaintiff has provided neither a direct admission nor any circumstantial evidence "that consists of ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff." *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006). Thus, she must attempt to prove her case under the indirect, *McDonnell Douglas* burden-shifting method.

*B. Indirect method*

The indirect method, as laid out in *McDonnell Douglas Corp. v. Green*,

> requires a plaintiff first to establish certain *prima facie* elements for either race discrimination or retaliation. Once this is done, through competent evidence, the burden of production shifts to the defendant to offer a permissible, noninvidious reason for the alleged discrimination. *Id.* If the defendant meets this production burden, the plaintiff may then rebut that evidence by showing that the employer's reasons are a pretext for discrimination or that the decision was tainted by impermissible, race-based motives.

*Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 897 (7th Cir. 2003) (internal citations omitted). To establish her *prima facie* case, Plaintiff must show that "(1) she was a member of a protected class; (2) she was meeting her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably." *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 530 (7th Cir. 2003).

Plaintiff satisfies the first element because it is not contested that she is African-American and that race is a protected class. Regarding the second element, however, Plaintiff is unable to demonstrate that she had met her employer's legitimate job expectations. First, Defendant's work policy, as circumscribed in the employee handbook, required employees to refrain from "[v]erbal or physical abuse/threats, intimidating, swearing, or coercing behavior directed toward (or in the presence of) a patient, visitor or Facility employee" as well as "[a]ny other misconduct which affects the quality of patient care service." The July 8, 2008 note indicated that Plaintiff was having difficulty with Patient A——. Plaintiff had said to A——, "I am not the one you want to mess with little girl." Plaintiff's Response challenges the characterization of this phrase as a "threat", rather, calling it an "inappropriate comment".

- 14 -

However, "inappropriate comments" of this type, even if they do not constitute "threats, intimidation, swearing, or coercing behavior," could certainly qualify as "misconduct [that] affects the quality of patient care service." The July 10, 2008 note indicated that A——'s mother had called Hamilton and complained that Plaintiff "was picking at her and threatening her". Plaintiff's Response challenges that statement as "hearsay from a troubled, institutionalized minor" and that "[i]t is necessary to discipline the troubled minors in ways that they don't like." However, hearsay or not, Plaintiff never goes so far as to deny that she threatened A—— or that A—— felt threatened, and has not provided any evidence challenging the substance of A——'s statements. "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Hadley v. Du Page County*, 715 F.2d 1238, 1243 (7th Cir. 1983).

Second, the employee handbook also requires employees to refrain from "[i]nsubordination, including refusal to do assigned work or refusal to perform work in the manner described by a supervisor without proper justification." On May 5, 2008, Jeff Smith, her direct superior, indicated in a note to Plaintiff's file that she had left without "taping on Track IV", that he had called her to return to complete the task, but that "apparently she did not want to return to tape." Plaintiff's Response challenges the interpretation of this document, asserting that Smith's "note is an explanation to the next supervisor coming in, that Plaintiff would make a verbal report instead of a taped report before the beginning of the next shift." However, Plaintiff again provides no evidence in support of this assertion, and thus, the court can give it no weight. On July 16, 2008, a note was entered in Plaintiff's file, indicating that Kobylanski, one of

Plaintiff's superiors, was coaching her when she "became loud and we moved to the OTR where she became more upset and rude, cursing and raising her voice. While talking to [Plaintiff], she walked away from the conversation saying that she didn't want to listen to this 'bullshit'". Plaintiff's Response does not contest the factual nature of the document or the interaction, but rather, challenges the authenticity of the document, noting that neither Kobylanski nor Plaintiff had signed the form. At the risk of beating a dead horse, summary judgment is not the appropriate time to make bald allegations of this nature. Instead, Plaintiff's failure to participate in discovery and subsequent failure to present any evidence gathered during that process in the form of enumerated contested material facts in her Rule 7.1(D)(2)(b) filing forces this court to deem Defendant's facts as admitted. Upon taking Defendant's facts and documents as true, it is clear that Plaintiff not only engaged in insubordination but also swore at her co-workers, in violation of workplace policy.

Last, her own annual performance review showed that of the 79 individual evaluation criteria, 8 of them, or 10%, rated a 2 on 4-point scale, indicating that her "[p]erformance is generally at acceptable level", that she "[u]nderstands facets of job", "[w]orks best with detailed instructions or requires addition supervision", with a "[l]evel of performance [that] can be improved", and for that criterion, that a "goal [was] required". The other 90% rated a "3", which indicated that she "[c]onsistently meets standard" and "[d]emonstrates acceptable knowledge in all areas of responsibility". Clearly, if a rating of "3" is that Plaintiff has acceptable knowledge in her areas of responsibility, and consistently meets Defendant's standards, a rating of "2" is below that level. In her performance review, DeJesus specifically noted her "harsh tones with the patients". In her Response, Plaintiff argues that Defendant overlooks her positive comments and

the "3" ratings. But having a mostly positive evaluation does not save an employee when the few

negative criticisms are so strong as to warrant termination of employment. Thus, between the

narrative in the performance review, the various notes in her file, and the event that led to the

meeting in which she resigned, Plaintiff's inability to communicate—whether to patients or co-

workers—in a manner acceptable to Defendant is a recurring theme. Accordingly, even

construing the evidence in the light most favorable to Plaintiff and drawing all reasonable

inferences in her favor, Plaintiff did not meet her employer's legitimate job expectations. As

Plaintiff cannot satisfy the second element of her *prima facie* claim, she cannot resist summary

judgment. However, out of an abundance of caution, this opinion examines the remaining

elements.

Regarding the requirement that she suffered an adverse employment action, the facts, as

Defendant presented, constitute a constructive discharge. Defendant argues that "no one actually

told [Plaintiff] that she was fired or terminated." However, this court disagrees. "When an

employer acts in a manner so as to have communicated to a reasonable employee that she will be

terminated, and the plaintiff employee resigns, the employer's conduct may amount to

constructive discharge." *E.E.O.C. v. Univ. of Chicago Hospitals*, 276 F.3d 326, 332 (7th Cir.

2002). As Plaintiff testified during her deposition, there were three floors at Pavilion. When she

was told that there was no place for her on the first, second, or third floor, that would have

communicated to a reasonable employee that Defendant no longer considered her an employee.

Further, Exhibit Q, an otherwise unidentified and undated document provided by Defendant,

states that "[d]ue to the noted concerns regarding [Plaintiff's] performance, her employment with

the Pavilion is being terminated effective immediately." Last, an email from Scoggins

specifically states that "[w]e were not able to discuss terminating her." Accordingly, taking the facts in the light most favorable to Plaintiff, Defendant not only intended to discharge her, but did in fact constructively discharge her.

Finally, Plaintiff must demonstrate that a similarly situated employee not in the protected class was treated more favorably. In her deposition, she testified that Robert Severins, a white male co-worker, slept during his shift, watched pornography, and failed to check on an at-risk patient as required, thereby missing a critical situation wherein that patient attempted to commit suicide. "In determining whether two employees are similarly situated a court must look at all relevant factors, the number of which depends on the context of the case. . . . This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, *and had engaged in similar conduct* without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (emphasis added). Regardless of whether Plaintiff's allegations regarding Severins are true (and Defendant aptly contests all of them, both in argument and with the documents attached to the Reply), she has failed to present a comparator employee who had engaged in the same prohibited behavior for which she was constructively discharged, *viz.*, using harsh tones and inappropriate language while speaking with patients and co-workers, failing to follow orders from her superiors in their entirety or in a timely fashion, and engaging in insubordination.

Accordingly, Plaintiff cannot meet her burden of proof on the second and fourth elements of the indirect method of proving her *prima facie* case. Because she has failed to state a *prima facie* case of discriminatory discharge under the indirect method, this court need not reach the

issue of pretext. *Cowan v. Glenbrook Sec. Services, Inc.*, 123 F.3d 438, 445 (7th Cir. 1997).

Defendant's Motion for Summary Judgment (#35) is therefore GRANTED.


      IT IS THEREFORE ORDERED THAT:

      (1) Defendant's Motion to Strike (#44) is GRANTED.

      (2) Plaintiff's Motion to Amend/Correct (#45) is DENIED.

      (3) Defendant's Motion for Summary Judgment (#35) is GRANTED.

      (4) This case is terminated.

             ENTERED this 7th day of 2013.

             **s/ Michael P. McCuskey**

             MICHAEL P. McCUSKEY
             U. S. DISTRICT JUDGE